# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TYRONE STURGEON,
    Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:08-cv-510
(Beckwith, J.; Hogan, M.J.)

## REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for Supplemental Security Income (SSI). This matter is before the Court on plaintiff's Statement

of Errors (Doc. 8), the Commissioner's response in opposition (Doc. 13), and plaintiff's reply

memorandum. (Doc. 14).

## PROCEDURAL BACKGROUND

Plaintiff was born in 1964 and was 37 years old at the time of the ALJ's decision. He has

a ninth grade education and past work experience as a horse jockey. Plaintiff filed an

application for SSI in March 2004, alleging an onset of disability of May 22, 2003, due to a

bulging disc and pinched nerve in his back, degenerative disc disease, and bi-polar disorder.

Plaintiff's application was denied initially and upon reconsideration. Plaintiff then requested and

was granted a de novo hearing before an administrative law judge (ALJ). Plaintiff, who was represented by counsel, appeared at a hearing before ALJ Ronald Jordan at which two Medical Experts and a Vocational Expert (VE) appeared and testified.

On January 17, 2007, the ALJ issued a decision denying plaintiff's SSI application. The ALJ determined that plaintiff suffers from a combination of severe impairments, including degenerative disc disease, pain disorder, borderline intellectual functioning, alcohol abuse, bipolar disorder, history of left knee ACL repair, history of bilateral elbow surgery, and arthritis of the bilateral hips. (Tr. 25). The ALJ also determined that such impairments do not individually or in combination meet or equal the Listing of Impairments. (Tr. 26). According to the ALJ, plaintiff retains the residual functional capacity (RFC) to exert up to 10 pounds of force occasionally and 5 pounds frequently to lift, carry, push or pull items. He can stand and walk 2 hours in an 8 hour day, but no more than 15 minutes each hour. He can sit for 8 hours but should have the opportunity to stand and stretch briefly (1-2 minutes) every 20-30 minutes to relieve pressure on his lower back and hips. He can occasionally stoop, crouch, crawl, kneel, balance, and climb stairs or ramps. Due to alleged side effects from pain medication, plaintiff should not climb ladders, scaffolds, or ropes and should not work around hazards such as unprotected heights or unguarded moving machinery. Plaintiff's work should involve only routine, repetitive tasks and understanding and carrying out only simple instructions. He should work in a stable, predictable work environment with few changes from day-to-day, and he should not be required to perform assembly line work. (Tr. 26). The ALJ determined that plaintiff's testimony concerning the intensity, persistence and limiting effects of his pain symptoms was not entirely credible. (Tr. 27). The ALJ determined that plaintiff could not perform his past relevant work,

2

but based on the vocational expert's testimony, could perform other jobs that exist in significant numbers in the national economy. (Tr. 32). Consequently, the ALJ concluded that plaintiff is not disabled under the Act and not entitled to disability benefits. The Appeals Council denied plaintiff's request for review making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20

3

C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the

4

Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is

5

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004); *Walters*, 127 F.3d at 530. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). In weighing the various opinions and medical evidence, the ALJ must consider other pertinent factors such as the length, nature and extent of the treatment relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's supportability by evidence and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6); *Wilson*, 378 F.3d at 544. In terms of a physician's area of specialization, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

If the Commissioner's decision is not supported by substantial evidence, the Court must

6

decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. 1990) (unpublished), 1990 WL 94. Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL EVIDENCE

Physical Impairments

Plaintiff was a horse jockey at River Downs Race Track for approximately twenty years until a racing injury on May 22, 2003. A subsequent MRI showed a disc bulge at L4-5 and L5-S1 with compression. (Tr. 586). He was evaluated by the Neurosurgery Clinic at Christ Hospital for back and right leg pain. On exam, plaintiff exhibited a positive straight leg raise, antalgic gait and decreased sensation. He was admitted for pain control. (Tr. 586).

Following this hospitalization, plaintiff was referred to Dr. Heis for evaluation of his low back pain complaints. At his initial visit, plaintiff complained of pain radiating from the back into the right posterior thigh and down to the heel, made worse with any type of bending, lifting or movement of the back. (Tr. 132). On exam, plaintiff exhibited limited range of motion of the hips and knees consistent with arthritis in the hip, tenderness to palpation, stiffness, 40° of forward flexion, 15° of extension and 20° of lateral flexion with pain. (Id.). Dr. Heis prescribed Naprosyn, Vicodin and Flexeril, and started plaintiff on a course of physical therapy. (Tr. 131, 133). Dr. Heis began administering epidural steroid injections to plaintiff in September of 2003 after physical therapy failed to provide any benefit. (Tr. 130, 219).

In a letter to Dr. Kramer dated September 26, 2003, Dr. Heis noted that plaintiff had failed conservative treatment and recommended that plaintiff consult a surgeon for consideration of the appropriateness of a fusion and stabilization procedure on his back. (Tr. 129).

Plaintiff was then evaluated by Dr. Roberts, an orthopedic surgeon, in October of 2003 for continuing low back and right leg pain. On exam, Dr. Roberts noted a normal gait, difficulty heel walking on the right, 90° of forward flexion with increased low back pain, a limitation to

8

10° of extension with increased low back pain, no tenderness on palpation, negative straight leg raising on the left, mildly positive straight leg raise on the right in a sitting and supine position with pain in his low back and right buttock, and normal reflexes, motor strength and sensation. (Tr. 136). Based on his findings, Dr. Roberts diagnosed degenerative joint disease of both hips and moderate degenerative changes through the lumbar spine with disc desiccation on three levels. He recommended chronic pain management. (Tr. 136). Dr. Roberts did not think plaintiff needed spine surgery and recommended that plaintiff see a joint specialist for his hips. (Tr. 136). In a letter dated October 23, 2003, Dr. Roberts stated that "[w]ith his numerous orthopaedic problems and, given the nature of his job as a jockey, it is my belief, Mr. Sturgeon, is totally disabled from all employment." (Tr. 217).

In December of 2003, plaintiff presented to the emergency room at University Hospital for right buttock pain. He underwent x-rays of the right hip and pelvis which showed early degenerative changes bilaterally with the presence of osteophytes. (Tr. 487, 491). Examination and motion through the hip did not produce pain. (Tr. 487). He was diagnosed with early degenerative disease of the bilateral hips. (Tr. 487).

Following Dr. Roberts' recommendation for chronic pain management, plaintiff began treating with Dr. Minhas in February of 2004. On initial exam, Dr. Minhas noted antalgic gait, tenderness over the paralumbar and SI joint region, restricted range of motion (30° flexion and 0° extension), grossly unremarkable sensory exam with some decreased sensation on the right in an L4 distribution, pain with femoral stretch and Faber's test, and negative straight leg raising. (Tr. 149). Dr. Minhas diagnosed low back pain with degenerative disc disease, facet joint syndrome and herniated disc lumbar spine, rule out radiculitis. He prescribed Methadone,

9

Voltaren, Nortriptyline and Depakote. (Tr. 150). Monthly follow-up appointments with Dr.

Minhas from February 2004 through July 2006 revealed fairly consistent findings of a normal

gait, normal gross motor coordination, mild limp, restricted range of motion of back and trunk,

4/5 motor strength, unremarkable sensory exam, some decreased sensation in right L4

distribution, pain on facet loading, and +2 reflexes, with diagnoses of low back pain,

degenerative disc disease, facet joint syndrome, herniated disc, and radiculitis. (Tr. 145, 147-

148, 199-206, 230, 607-626).

Plaintiff twisted his knee on April 26, 2004 and presented to the emergency room at

Good Samaritan Hospital for evaluation. Examination of the left knee revealed pain on

palpation. Plaintiff was unable to walk on his leg. He was placed in an elastic wrap and given a

prescription for Ultram. (Tr. 138).

A non-examining state agency physician in August 2004 opined that plaintiff was limited

to lifting and/or carrying 50 pounds occasionally and 25 pounds frequently; standing and/or

walking about 6 hours total; sitting about 6 hours total; unlimited pushing and/or pulling; no

climbing of ladder/rope/scaffolds; and occasional kneeling. (Tr. 174, 175).

Plaintiff presented to the emergency room at Christ Hospital in June of 2005 after

sustaining injuries to his back from a motor vehicle accident. Plaintiff complained of severe,

right-sided back pain and numbness and tingling in his right leg immediately after the accident

and rated his pain as a 10/10. (Tr. 241). On exam, plaintiff initially exhibited a reduction of

strength to 3 out of 5 in his right lower extremity, decreased proprioception, and right-sided

decreased sensation to pinprick on the right side. (Tr. 242). After receiving pain medication and

muscle relaxants, plaintiff improved, and was discharged with a referral to a neurosurgeon. (Tr.

245).

Plaintiff's treating physician, Dr. Blinzler, completed a Basic Medical form for the Department of Job and Family Services on July 16, 2005, in which she diagnosed lumbar disc disease, osteoarthritis, bipolar and anxiety and depression. (Tr. 226).

In October of 2005, plaintiff presented to the emergency room at University Hospital for buttocks pain radiating down his left leg. (Tr. 496). Examination of the lower back and buttocks region indicated point tenderness over the sacroiliac joint and inferior to that along the posterior aspect of the legs. (Tr. 497). Plaintiff was discharged home with a diagnosis of exacerbation of lower back pain. (Id.). He returned to the emergency room at University Hospital in February of 2006 for re-evaluation of low back pain. (Tr. 574). On exam, he exhibited palpable spasm on his right and left lumbar paraspinous muscles. Neurological findings were normal. He was diagnosed with an acute exacerbation of chronic low back pain and instructed to see his pain management specialist. He was advised that he would not receive any narcotic medication from the emergency department, which "rather upset" him. (Tr. 575).

In December of 2006, plaintiff presented to the emergency room at Mercy Hospital – Western Hills for low back pain. He described his pain as shooting down his right leg with numbness and tingling. On exam, he exhibited tenderness to palpation in the right lower lumbar region and pain with straight leg raise. Reflexes were 1+ in the right and 2+ in the left patellar. He had no sensory deficits and full range of motion. Sensation was intact. (Tr. 695). An MRI of the lumbar spine evidenced broad based central and right foraminal/lateral L4-L5 disc protrusion producing mild flattening of the thecal sac and mild to moderate right L4 foraminal stenosis with mild displacement of the lateral right L4 nerve root, and degenerative disc disease at the L5-S1

11

level producing mild to moderate bilateral L5 foraminal stenosis. (Tr. 720). Plaintiff was discharged with a diagnosis of acute exacerbation of chronic back pain. (Tr. 695).

Plaintiff returned to the emergency room on January 5, 2007 for worsening back pain. On exam, he exhibited paralumbar and spinal tenderness with spasm, with negative straight leg raising. (Tr. 702). His discharge diagnosis was acute back pain with right leg sciatica. (Id.).

Plaintiff was also evaluated by Richard Lowstutter, Jr., DPM in December of 2006 for painful feet. On exam, he exhibited pain on palpation, worse on the left, varus deformity bilaterally, and Taylor's bunion bilaterally. (Tr. 654). In a follow-up appointment, he was also diagnosed with neuropathy, abnormal pronation and plantar fasciitis. (Tr. 655).

Mental Impairments

Plaintiff began treating with Core Behavioral Health Centers in November of 2003 for depression due to his back injury. On initial evaluation, he reported serious and frequent mood swings, usually causing him to be very irritable and angry; paranoid ideation; racing thoughts; poor concentration; impulsive spending; and history of alcohol abuse with one year of sobriety. (Tr. 183). Plaintiff was diagnosed with bipolar disorder and alcohol dependence in early full remission and assigned a GAF of 55. (Tr. 196). It was recommended that plaintiff undergo outpatient therapy with psychiatry. (Tr. 195).

In June 2004, a Core termination summary noted "very sporadic attendance to therapy sessions with frequent cancellations and no-shows," with a last contact date of April 26, 2004. (Tr. 209). The summary stated that plaintiff was unable to remain medication compliant throughout treatment. (Tr. 209).

At the request of the Administration, plaintiff was evaluated by David Chiappone, Ph.D.,

on May 11, 2004. Plaintiff reported that he had been involved with outpatient psychiatric treatment for about six months for "mood swings," attending clinic every two weeks. (Tr. 152). He also reported that he cannot complete household chores due to pain. (Id.). During the interview, plaintiff complained of pain and sat uncomfortably in his chair. (Tr. 153). Based on his evaluation, Dr. Chiappone diagnosed a pain disorder due to both psychological factors and a general medical condition, alcohol abuse in remission, and borderline intellectual functioning, and assigned a GAF of 61. (Tr. 154). Dr. Chiappone found plaintiff had a moderately reduced tolerance for stress. (Id.).

A non-examining state agency psychologist found that plaintiff had moderate difficulties in maintaining concentration, persistence or pace, a moderately limited ability to understand and remember detailed instructions, a moderately limited ability to carry out detailed instructions, a moderately limited ability to complete a normal workday and workweek without interruptions, and a moderately limited ability to respond appropriately to changes in the work setting. (Tr. 166, 169, 170).

In addition to the Basic Medical form, Dr. Blinzler completed a Mental Functional Capacity Assessment dated July 16, 2005 in which she found plaintiff had a markedly limited ability to remember locations and work-like procedures, understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (Tr. 227). Based on the above limitations, Dr. Blinzler concluded that plaintiff was unemployable for 12-months or more. (Tr. 228).

13

In October 2005, plaintiff returned to Core seeking a return for on-going treatment for his mood disorder. (Tr. 632). The intake evaluation noted that Dr. Minhas, his pain doctor, was currently treating him for chronic pain and a mood disorder and that his medications included Depakote, Neurontin, Methadone, and Ambien. (Tr. 634, 637). The evaluation noted that his thoughts were organized and goal directed; energy was low to fair, and concentration "has to be good when my son is around" but is less usually. (Tr. 637). He complained about being anxious and depressed. *Id.*

A Core Medical Intake Form from November 2005 showed plaintiff reported an increase in his depression, decreased concentration and focus, decreased sleep and chronic pain issues. (Tr. 648). On exam, plaintiff exhibited a lack of concentration or focus. (Tr. 649). Psychiatric Nurse Practitioner Sue Wheeler diagnosed bipolar disorder and a personality disorder, NOS, and alcohol abuse in remission, assigned a GAF of 55, and advised plaintiff to increase his Depakote. (Id.).

A November 2005 mental functional capacity evaluation completed by Core nurse practitioner Wheeler and co-signed by psychiatrist Dr. Nieman stated plaintiff had a markedly limited ability to maintain attention and concentration for extended periods. (Tr. 214). Plaintiff was noted to exhibit poor concentration and focus, erratic behavior and numerous complaints of chronic pain. (Tr. 215).

Core progress notes from December 2005 through August 2006 include objective findings of pressured speech, rambling speech, easy distractibility, lability, tearfulness, limited insight and judgment, superficially bright mood and affect, impulsivity, and psychomotor agitation. (Tr. 638-647).

14

In a mental RFC dated August 22, 2006, Core treating psychiatrist Jonathan Rosenthal, M.D., opined that plaintiff has only a fair ability to follow work rules; to interact with supervisors; to function independently and maintain attention and concentration; to understand, remember and carry out either simple or detailed job instructions; to behave in an emotionally stable manner; or to relate predictably in social situations. (Tr. 628-630). Dr. Rosenthal further opined that plaintiff has a poor or no ability to deal with work stresses; to understand, remember and carry out complex job instructions; and to demonstrate reliability based on his history of emotional lability and irritability, sleeping poorly, and history of impulsive physical acting out. (Id.). Dr. Rosenthal also opined that plaintiff would experience frequent, unscheduled interruptions in the workday; frequent episodes of intrusive thinking in the work place; and frequent absenteeism (at least three days per month) from a work environment as a result of his underlying psychological/psychiatric impairment. (Tr. 630). Dr. Rosenthal concluded by stating that both emotional and physical factors impair plaintiff's ability to maintain attention and be able to physically stay sitting and or upright except for short periods. (Id.).

Subsequent to the hearing decision in this matter, Dr. Rosenthal reported in a recorded statement taken on January 18, 2007 that he has seen plaintiff once a month since May of 2006, during which time plaintiff has been very compliant with his treatment and hasn't missed appointments. (Tr. 715, 716). He noted that plaintiff's working diagnoses are currently bipolar disorder and a pain disorder for which he treats plaintiff with Depakote, Klonopin and Neurontin. In support of the above RFC he completed, Dr. Rosenthal indicated that plaintiff's ability to work would be limited by signs and symptoms including difficulty concentrating, problems sitting or standing in one place for a long time, short-term memory problems, inability to handle stress, and

15

frequent interruptions from chronic pain. (Tr. 715- 718). He further indicated that plaintiff "can't be counted on from day-to-day, let alone from even hour-to-hour, to be able to consistently perform and stay at a task and concentrate on it both from the ability of his mind to stay focused and his being interrupted by pains." (Tr. 716). Dr. Rosenthal concluded by stating that plaintiff is incapable of any sustained gainful kind of employment. (Tr. 718).

Hearing Testimony of Medical Experts

Dr. Hershel Goren, board-certified neurologist, testified as a medical expert. (Tr. 779-821). Dr. Goren described his review of the medical records; he noted plaintiff's reports of back pain and that physicians had agreed plaintiff had spine pain. (Tr. 780). Dr. Goren stated that plaintiff's MRI of his lumbar spine was only mildly abnormal and physical examinations had been only slightly abnormal. (Tr. 780). Dr. Goren discussed Dr. Roberts' conclusive statement of October 2003 that plaintiff's was disabled. (Tr. 780-781). However, Dr. Roberts' examination was only mildly abnormal and Dr. Goren testified that he did not "see any reason for Doctor Roberts' saying Claimant is disabled." (Tr. 781). Dr. Goren discussed plaintiff's 1997 left knee surgery and noted no reported problems following that time. (Tr. 781). Dr. Goren found no information concerning plaintiff's elbow complaints. (Tr. 781). Dr. Goren assessed plaintiff's residual functional capacity and concluded that plaintiff should be able to perform light work with no climbing ladders, ropes or scaffolds; could occasionally climb stairs/ramps, stoop, crouch, crawl and kneel; and could not work around unprotected heights. (Tr. 782). On cross-examination, Dr. Goren conceded he was not basing his RFC on any exhibits, stating "my knowledge of the medical literature is that when functional capacity evaluations have been done on individuals with his much–with his kind of problem, they're able to function at a light level."

16

(Tr. 783-84). Dr. Goren disagreed with Dr. Minhas's prescribing Methadone to treat plaintiff's pain. (Tr. 784-85). Dr. Goren also testified that medications such as Neurontin and Methadone could have side effects that would degrade a person's concentration, persistence and pace, focus, memory and response time. (Tr. 809).

Terry Schwartz, Psy. D., reported "the big picture" reflected in the record that plaintiff had bipolar disorder as well as a problem with alcohol. (Tr. 822). Dr. Schwartz testified that the medical evidence concerning alcohol abuse was inconclusive. (Tr. 832). Dr. Schwartz testified that there was an inconsistency between Dr. Rosenthal's progress notes, assessment, and ultimate conclusion concerning plaintiff's residual functional capacity. (Tr. 829-830, 835-837). On the other hand, Dr. Schwartz agreed that Dr. Rosenthal treated plaintiff for a long enough period to reach reasonably supported conclusions about his functioning. (Tr. 840).

## OPINION

Plaintiff assigns two errors in this case. First, plaintiff asserts this matter should be remanded under Sentence Six of 42 U.S.C. § 405(g) on the basis of new and material evidence. Second, plaintiff contends the ALJ erred in failing to accord the proper weight to the opinions of plaintiff's treating physicians. For the reasons that follow, the Court finds this matter should be remanded for further proceedings.

Plaintiff seeks a remand based on new and material evidence, specifically Dr. Rosenthal's January 2007 recorded statement and the MRI findings of December 2006. The Court finds plaintiff's request well-taken and that a remand under Sentence Six is appropriate in this case.

"The district court can . . . remand the case for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was

17

good cause for not presenting it in the prior proceeding." *Cline v. Commissioner of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996). Evidence is "new" if it was not in existence or available to the claimant at the time of the administrative proceeding. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Evidence is considered "material" if "there is a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Foster*, 279 F.3d at 357 (citations and internal quotation marks omitted). To show "good cause" the moving party must present a valid justification for the failure to have acquired and presented the evidence in the prior administrative proceeding. *Id*. *See also Oliver v. Secretary of H.H.S.*, 804 F.2d 964, 966 (6th Cir. 1986); *Willis*, 727 F.2d at 554.

In this case, Dr. Rosenthal's statement of January 18, 2007 is new as it was not in existence at the time of the administrative proceeding. *Foster*, 279 F.3d at 357. The evidence is also material because it directly bears on plaintiff's ability to function in a work environment and addresses the compliance issues raised by the ALJ in his decision. (Tr. 30). The ALJ gave Dr. Rosenthal's RFC opinion "little weight," citing to the alleged inconsistency with his treatment notes and the fact that Dr. Rosenthal only saw plaintiff two times. (Tr. 31). In assessing plaintiff's mental functioning, the ALJ also stated that plaintiff "has not been particularly compliant with treatment." (Tr. 30).

Contrary to the ALJ's finding, Dr. Rosenthal in fact treated plaintiff on more than two occasions prior to the ALJ's decision. Dr. Rosenthal's January 2007 statement indicates he saw plaintiff once per month since May 2006 and that plaintiff "has been very compliant"with his treatment. (Tr. 716). Dr. Rosenthal states, "He hasn't missed appointments and he's . . . we've worked closely on adjusting his medicines and he's been faithful in sticking to that." (Tr. 716).

Dr. Rosenthal also described, in detail, the basis for his previous functional capacity assessment. Dr. Rosenthal stated that plaintiff was being treated for both bipolar disorder and an underlying pain disorder for which Dr. Rosenthal prescribed Depakote, Clonipin, and Neurontin. (Tr. 715). Dr. Rosenthal opined plaintiff would have poor or no ability to deal with work stressors:

> With his nerve disorder, he has some difficulty concentrating and he also has an impairment from chronic pain. So he cannot sit or stand in one place for a long time. His mind tends to run a little quicker than most people so his concentration gets impaired because of that also.

(Tr. 715). Dr. Rosenthal also opined that stress would aggravate plaintiff's underlying chronic pain condition (Tr. 715) and that plaintiff would experience frequent, unscheduled interruptions in any type of work day as a result of his underlying psychological and psychiatric impairments: "He tends to be rather tense and anxious and his mind is sped up at times so his concentration is going to be impaired, his ability to stay focused on anything. Then he's also interrupted by pains and that again would distract his mind from being able to concentrate on anything." (Tr. 716). Dr. Rosenthal also opined that plaintiff would "absolutely not" be able to sustain work activities five days per week, eight hours per day based on his underlying psychological conditions: "He just can't be counted on from day to day, let alone from even hour to hour to be able to consistently perform and stay at a task and concentrate on it both from the ability of his mind to stay focused and his being interrupted by pain." (Tr. 716). Dr. Rosenthal did not think plaintiff could sustain even a simple one and two step type job for the foreseeable future due to his emotional and physical problems. (Tr. 716-17). He also opined that plaintiff would not be able to work in an environment that required a sustained work pace: "At best, he might be able to do something in a sheltered workshop where he would be allowed to take breaks whenever he

19

needed them and of variable periods." (Tr. 718). Dr. Rosenthal described the "vicious cycle" between plaintiff's chronic pain condition and his underlying bipolar disorder:

> [C]hronic pain can end up looking and/or exacerbating depression and if you tried to look at the symptomatologies its very similar. You know, he has physical pain that tends to limit his activity and he had been a very active guy by the way physically. He had been a jockey and then that drags you down psychologically and then you get tense, your muscles tighten, you get more pain. It's a vicious cycle.

(Tr. 718). Dr. Rosenthal opined that plaintiff was incapable of any sustained gainful employment. (Tr. 718). This evidence is material because it strongly suggests that plaintiff is unable to perform even the simple, routine, repetitive work identified by the ALJ in finding plaintiff not disabled.

Plaintiff also submitted December 2006 MRI findings to the ALJ on January 2, 2007, prior to the ALJ's January 17, 2007 decision. The MRI showed broad based central and right foraminal/lateral L4-L5 disc protrusion producing mild flattening of the thecal sac and mild to moderate right L4 foraminal stenosis with mild displacement of the lateral right L4 nerve root, and degenerative disc disease at the L5-S1 level producing mild to moderate bilateral L5 foraminal stenosis. (Tr. 720). However, the ALJ's decision omits any discussion of this evidence and it is not clear whether the ALJ actually received the evidence prior to issuing his decision. (Tr. 16). Because this evidence provides an objective basis for plaintiff's complaints of pain and supports Dr. Minhas's opinion that plaintiff suffers from significant radiculopathy from a defective disc, which directly contradicts the testimony of the medical expert at the hearing upon which the ALJ relied, this evidence is also considered material for purposes of a Sentence Six remand. The MRI evidence and Dr. Rosenthal's statement, in conjunction with the other

20

evidence of record, demonstrates there is a reasonable probability that a different disposition would result from consideration of this evidence. *Foster*, 279 F.3d at 357.

Also, good cause for remand exists. The January 2007 Rosenthal statement was not available at the ALJ hearing. *See Fazio v. Heckler*, 750 F.2d 541, 542 -543 (6th Cir. 1984); *Wilson v. Secretary of Health and Human Services*, 733 F.2d 1181, 1182-83 (6th Cir. 1984). Plaintiff's counsel made numerous requests prior to the ALJ's January 17, 2007 decision to keep the record open specifically for the purpose of submitting a statement from Dr. Rosenthal who was unavailable due to his schedule. (Tr. 35, 36, 37, 724). Counsel also requested that the ALJ consider the new MRI evidence, but the ALJ's decision does not reflect that it in fact was received and considered. Plaintiff has presented a valid justification for not acquiring and presenting this evidence in the prior administrative proceeding. Therefore, good cause exists for a remand in this matter.

Based on the above, the Court recommends that this matter be remanded under Sentence Six of Section 405(g) for a re-evaluation of plaintiff's RFC and his ability to perform substantial gainful activity based on the new and material evidence submitted by plaintiff.

Plaintiff also contends the ALJ erred by failing to give proper weight to the opinions of plaintiff's treating physicians. In terms of plaintiff's physical impairments, plaintiff asserts that both Drs. Roberts and Minhas opined that plaintiff was unable to work. (Doc. 8 at 17, citing Tr. 217, 231). Plaintiff alleges that these opinions are supported by the following physical findings: positive straight leg raise, antalgic gait, decreased sensation, limited range of motion, tenderness to palpation, stiffness, difficulty heel walking, pain with femoral stretch, positive Faber's test, and spasm (Tr. 132,136, 149, 497, 575, 586, 695, 702), as well as objective x-rays and MRI

21

findings which evidence degenerative changes. (Tr. 491, 720). (Doc. 8 at 17).

In a letter dated October 23, 2003, Dr. Roberts stated that "[w]ith his numerous orthopaedic problems and, given the nature of his job as a jockey, it is my belief, Mr. Sturgeon, is totally disabled from all employment." (Tr. 217). The ALJ gave Dr. Roberts' opinion no weight because it was given "well before the date of application and does not take into account the possibility of subsequent improvement (and Dr. Minhas' notes do allege improvement in pain levels)." (Tr. 28). The ALJ also noted that Dr. Roberts' conclusory statement was not entitled to deference under the Social Security regulations. (Tr. 28). Finally, the ALJ cited to Dr. Goren, the medical expert, who testified that plaintiff's examination with Dr. Roberts revealed only minimally abnormal findings which would not result in disability. (Tr. 28).

The ALJ's decision rejecting Dr. Roberts' conclusion that plaintiff was "totally disabled from all employment" is supported by substantial evidence. The ALJ need not defer to a treating doctor's conclusion of "disability" since the ultimate responsibility for making disability decisions rests with the Commissioner. *See* 20 C.F. R. § 416.927(e)(1), (2). *See also Cohen v. Secretary,* 964 F.2d 524, 528 (6th Cir. 1992); *King v. Heckler,* 742 F.2d 968, 973 (6th Cir. 1984). The disability determination includes the consideration of numerous factors, only one of which is impairment from a medical standpoint, and is "reserved exclusively to the Secretary or to various state agencies." *King,* 742 F.2d at 973 (citing 42 U.S.C. § 421). Since it was not Dr. Roberts' prerogative to make the legal determination of disability, the ALJ was not bound by his conclusory statement. In addition, Dr. Roberts based his opinion on a single examination which did not elicit clinical findings supporting his extreme opinion. (Tr. 135-36). As the ALJ reasonably found, the record before the ALJ failed to demonstrate a neurological impairment

22

associated with plaintiff's back impairment. (Tr. 27). In addition, Dr. Roberts' finding of "mildly positive" straight leg raising in October 2003 was not reproduced in other examinations and the pain described by Dr. Roberts was not radicular pain, but "pain in the low back and right buttock." (Tr. 27, 135-136). While Dr. Roberts' examination also showed difficulty heel walking on the right, 90° of forward flexion with increased low back pain, and a limitation to 10° of extension with increased low back pain, plaintiff's exam also showed a normal gait, no tenderness on palpation, negative straight leg raising on the left, and normal reflexes, motor strength, and sensation. (Tr. 136). Dr. Goren testified that plaintiff's May 2003 MRI was only mildly abnormal (Tr. 143) and that his physical examinations had been only slightly abnormal. (Tr. 780). Throughout his examinations with Dr. Minhas, plaintiff consistently exhibited a normal gait, normal gross motor coordination, mild limp, restricted range of motion of back and trunk, 4/5 motor strength, unremarkable sensory exam, some decreased sensation in right L4 distribution, pain on facet loading, and +2 reflexes. (Tr. 145, 147- 148, 199-206, 230, 607-626). In view of the lack of objective and clinical findings supporting Dr. Roberts' conclusion of total disability, the ALJ's decision to give no weight to this opinion is supported by substantial evidence in the record.

Plaintiff also argues the ALJ erred by not deferring to Dr. Minhas's opinion that "plaintiff was unable to work." (Doc. 8 at 17). Dr. Minhas, however, actually opined that plaintiff was "disable[d] from previous job duty" (Tr. 231), *i.e.,* as a horse jockey, a conclusion with which the ALJ did not disagree. (Tr. 32). Dr. Minhas offered no other opinion on plaintiff's ability to work or the specific physical limitations resulting from plaintiff's back impairment or pain. Therefore, the ALJ did not err in evaluating Dr. Minhas's opinion.

Plaintiff also contends the ALJ failed to give appropriate weight to the mental RFC opinions of plaintiff's treating mental health professionals. (Doc. 8 at 17, citing Tr. 215, 227, 628). The first RFC (Tr. 215) is one completed on November 30, 2005 by Sue Wheeler, a nurse practitioner at Core, and co-signed by Dr. Melinda Nieman, M.D. The assessment rated plaintiff moderately limited in ten functional areas, and markedly limited in the ability to maintain attention and concentration for extended periods. (Tr. 214). The ALJ gave this assessment no weight, finding it conflicted with the assessment of consultative examiner Chiappone who performed formal psychological testing and reported only mild to moderate limitations. (Tr. 30, 152-154). The ALJ also noted that Nurse Wheeler did not do any formal testing, and that subsequent sessions in December 2005 and February 2006 showed plaintiff's moods as leveling out and that he was coping better with stressors. (Tr. 30).

The ALJ's decision is substantially supported by the record. There is no indication that Dr. Nieman ever saw or treated plaintiff prior to signing off on this assessment. (Tr. 31). In addition, the assessment was completed the same day that plaintiff returned to Core to reestablish therapy and after only one intake evaluation. Since Dr. Chiappone's assessment was consistent with the results of the objective tests and his mental status examination, the ALJ was free to give more weight to his one-time assessment over the conflicting one-time assessment of Nurse Wheeler who performed no testing. 20 C.F.R. § 416.927(d)(3), (5). *See Bradley v. Sec. of Health & Human Servs.,* 862 F.2d 1224, 1227 (6th Cir. 1988) (ALJ's responsibility to weigh and resolve conflicts in medical evidence). Moreover, Nurse Wheeler's assessment stated that plaintiff's mental limitations were expected to last "between 9 months and 11 months" (Tr. 215), which is less than the twelve month durational requirement for a finding of disability under the

24

Act. *See* 20 C.F.R. § 416.905. Therefore, even if the ALJ failed to accord proper weight to this opinion, Nurse Wheeler's RFC would not establish plaintiff was disabled under the Act in any event.

The ALJ also gave "little weight" to the mental RFC opinion of Dr. Blinzler "as she is an Internist primary care physician giving a mental assessment." (Tr. 31, Tr. 226-228). The ALJ was free to give more weight to Dr. Chiappone, a practitioner who specializes in mental health issues and testing, than to Dr. Blinzler, a primary care physician. *See* 20 C.F.R. § 416.927(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her specialty than to the opinion of a source who is not a specialist."). In addition, plaintiff has pointed to no clinical records or progress notes of Dr. Blinzler's upon which she based her opinion on plaintiff's mental functioning. In the absence of such evidence, the ALJ did not err in giving little weight to Dr. Blinzler's unsupported assessment.

The last mental RFC assessment is from Dr. Rosenthal, the Core psychiatrist who began treating plaintiff in May 2006. Dr. Rosenthal opined that plaintiff had a poor or no ability to deal with work stresses, to understand, remember and carry out complex job instructions, and to demonstrate reliability, and that plaintiff would experience frequent, unscheduled interruptions in the workday, frequent episodes of intrusive thinking in the work place, and frequent absenteeism (at least three days per month) from a work environment as a result of his underlying psychological/psychiatric impairment. (Tr. 630). Based on Dr. Rosenthal's assessment, the VE testified there would be no jobs plaintiff could perform. (Tr. 846).

The ALJ gave this assessment little weight. The ALJ determined that Dr. Rosenthal's

assessment was inconsistent with his treatment notes and the overall record based on the testimony of medical expert Dr. Schwartz. (Tr. 31). The Commissioner also argues that the reports of Dr. Chiappone and the state agency physicians show that plaintiff's symptoms were not as severe as assessed by Dr. Rosenthal in his RFC report. (Doc. 13 at 13-14).

The ALJ's basis for rejecting Dr. Rosenthal's RFC assessment is without substantial support in the record. First, the ALJ relied on the testimony of the medical advisor, Dr. Schwartz, who testified that the GAF of 55 and Dr. Rosenthal's treatment notes showed only "moderate" symptoms while Dr. Rosenthal's RFC report showed more severe symptoms. (Tr. 826-830). However, on cross-examination, Dr. Schwartz admitted that he did not know what Dr. Rosenthal meant by the term "moderate" as used in his RFC report. (Tr. 836-837). In addition, the ALJ appeared to acknowledge that Dr. Rosenthal's RFC report relayed information on plaintiff's limitations in the context of a work environment, whereas his treatment records did not. (Tr. 838). Moreover, at the hearing, the ALJ acknowledged that Dr. Rosenthal based his opinion not only on his individual meetings with plaintiff but on the notes of plaintiff's therapy sessions with other Core practitioners. (Tr. 827-28). However, in his decision, the ALJ cited to only Dr. Rosenthal's individual session notes in discounting Rosenthal's opinion as unsupported. (Tr. 31, finding that Dr. Rosenthal saw plaintiff only two times for medication evaluations in May and August 2006, and assessed 0/10 and 2/10 in medication side effect severity and 6/10 and 5/10 in overall level of functioning). Yet, the clinical notes of the other Core mental health personnel show lack of concentration, pressured and rambling speech, easy distractibility, lability, tearfulness, limited insight and judgment, superficially bright mood and affect, impulsivity, and psychomotor agitation (Tr. 631-652) and support the assessment of Dr.

Rosenthal.

Second, the Commissioner's reliance on Dr. Chiappone's consultative examination and the state agency doctors in upholding the decision of the ALJ is also misplaced. The ALJ stated that "the claimant told Dr. Chiappone in *May 2005* that he did not have crying spells, anhedonia, suicidal ideation, or hopelessness about the future. The claimant denied hallucinations, obsessions, compulsions, panic attacks, flashbacks, or nightmares. He rated his depression at only a '4' of 10 in severity." (Tr. 30) (emphasis added). In actuality, Dr. Chiappone examined plaintiff not in May 2005, but one year earlier in May 2004, at a time when plaintiff was not compliant with his treatment or medication regimen Core. (Tr. 151). It appears from the record that plaintiff's mental condition deteriorated subsequent to Dr. Chiappone's examination prompting him to seek mental health treatment at Core in October 2005. Likewise, the state agency physicians rendered their opinions in August 2004 and February 2005, at a time prior to plaintiff's resumption of treatment at Core. (Tr. 155-171). While Dr. Chiappone's report and the state agency doctors' report support the ALJ's findings on plaintiff's functioning prior to October 2005, they say little about plaintiff's functioning thereafter.

The ALJ must articulate "good reasons" for not giving weight to a treating physician's opinion and such reasons must be based on the evidence of record. *See Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). In this case, the ALJ's reasons for rejecting Dr. Rosenthal's RFC assessment are not supported by substantial evidence in the record. Therefore, the ALJ's decision in this regard should be reversed.

In determining whether this matter should be reversed outright for an award of benefits or

remanded for further proceedings, the Court notes that all essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits from plaintiff's alleged onset date. *Faucher*, 17 F.3d at 176. While Dr. Rosenthal's August 2006 mental RFC is strong evidence plaintiff cannot perform the simple, routine, repetitive work identified by the VE, there remain unresolved issues regarding plaintiff's alleged onset date of disability and duration thereof. This matter should therefore be remanded for further proceedings and the taking of additional evidence pursuant to Sentence Four of 42 U.S.C. § 405(g).

## A "DUAL BASIS" REMAND IS WARRANTED

This case involves both a Fourth Sentence and a Sixth Sentence remand under § 405(g). Under Sentence Four of § 405(g),[1] the Court is authorized to enter "a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." Here, a remand under Sentence Four is appropriate because "all of the essential factual issues have not yet been resolved." *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994); *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

In a Sentence Six remand,[2] the Court does not rule on the correctness of the

---

[1]Sentence Four of § 405(g) provides, "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

[2]Sentence Six of § 405(g) provides in full:

The court may, on motion of the Secretary made for good cause shown before he files his answer, remand the case to the Secretary for further action by the Secretary, and it may at any time order additional evidence to be taken before the Secretary, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Secretary shall, after the case is remanded, and after

administrative decision as in a Sentence Four determination. *Faucher v. Secretary of H.H.S.*, 17

F.3d 171, 174 (6th Cir. 1994) (citing *Melkonyan v. Sullivan*), 501 U.S. 89 (1991)). Instead:

> [T]he court remands because new evidence has come to light that was not
> available to the claimant at the time of the administrative proceeding and that
> evidence might have changed the outcome of the prior proceeding. The statute
> provides that following a sentence six remand, the Secretary must return to the
> district court to "file with the court any such additional or modified findings of
> fact and decision, and a transcript of the additional record and testimony upon
> which his action in modifying or affirming was based."

*Melkonyan*, 501 U.S. at 97-98 (citations omitted). As discussed above, a Sixth Sentence remand

is warranted to allow for consideration of the December 2006 MRI evidence and Dr. Rosenthal's

January 2007 recorded statement and the impact thereon on plaintiff's physical and mental

functioning.

Where a remand is warranted under both Sentence Four and Sentence Six, the Court may

remand under both grounds. As explained by the Eleventh Circuit:

> To summarize, after reviewing § 405(g) and the applicable case law, . . . if both
> sentence-four and sentence-six grounds for remand exist in a disability case, the
> case may be remanded on both grounds. District court jurisdiction over the case
> continues after the entry of the remand judgment as a result of the sentence-six
> prong of the remand. If a claimant achieves a remand on both sentence-four and
> sentence-six grounds, and thereafter succeeds on remand in part due to the
> sentence-six ground, the claimant may return to district court to request entry of
> judgment after remand proceedings have been completed. In such a case, the
> claimant may wait until the post-remand judgment is entered before filing his
> EAJA application.

*Jackson v. Chater*, 99 F.3d 1086, 1097-98 (11th Cir. 1996). Other courts have likewise

---

hearing such additional evidence if so ordered, modify or affirm his findings of fact or his decision,
or both, and shall file with the court any such additional and modified findings of fact and
decision, and a transcript of the additional record and testimony upon which his action in
modifying or affirming was based.

concluded that "dual basis" remands are appropriate in instances similar to the case at hand pursuant to both Sentence Four and Sentence Six. *See, e.g., Bradley v. Barnhart,* 463 F. Supp.2d 577, 583 (S.D. W. Va. 2006); *Olivero v. Barnhart,* 2006 WL 980562 (D. Conn. March 24, 2006); *Joe v. Apfel,* 1998 WL 683771, **3-4 (W.D.N.Y. July 10, 1998).

Accordingly, it is recommended that this matter be reversed and remanded under Sentence Four of Section 405(g) with directions to the ALJ to apply the correct legal standard when evaluating Dr. Rosenthal's functional assessment and opinion in determining plaintiff's RFC, and to resolve any issues regarding plaintiff's alleged onset date of disability and duration thereof.

It is also recommended that this matter be remanded under Sentence Six of Section 405(g) for consideration of the December 2006 MRI evidence and Dr. Rosenthal's January 2007 recorded statement.

## IT IS THEREFORE RECOMMENDED THAT:

1. The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g); and

2. This matter be **REMANDED** pursuant to Sentence Six of 42 U.S.C. § 405(g).

Date: 6/10/09

Timothy S. Hogan
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TYRONE STURGEON,
    Plaintiff

    vs

Case No. 1:08-cv-510
(Beckwith, J.; Hogan, M.J.)

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

## NOTICE TO PARTIES REGARDING FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **fifteen (15) days** after being served with this Report and Recommendation. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).